IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ELIZABETH HICKS,                                          Case No. 2:17-cv-00118-SB

                Plaintiff,                       **OPINION AND ORDER**

      v.

LES SCHWAB TIRE CENTERS OF
PORTLAND, INC., an Oregon corporation,

                Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Elizabeth Hicks ("Hicks") brings this action against her employer, Les Schwab Tire

Centers of Portland, Inc., an Oregon corporation ("Les Schwab").[1] Hicks asserts federal law

claims of disability discrimination and retaliation pursuant to the Americans with Disabilities Act

("ADA") (42 U.S.C. §§ 12112 & 12203). Hicks also asserts state law claims of disability

discrimination (OR. REV. STAT. ("O.R.S.") § 659A.112), disability retaliation (O.R.S. §

659A.109), workers' compensation — retaliatory discrimination (O.R.S. § 659A.040), and

_____

     [1] Plaintiff terminated Les Schwab Tire Centers of Oregon, Inc., an Oregon corporation,
and Les Schwab Headquarters, LLC, an Oregon limited liability company, as defendants on May
23, 2017.

workers' compensation — failure to reinstate (O.R.S. § 659A.043) and failure to reemploy (O.R.S. § 659A.046).[2]

The Court has original jurisdiction over Hicks' ADA claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Hicks' state law claims pursuant to 28 U.S.C. § 1367(a). All parties consent to jurisdiction by a magistrate judge (ECF No. 25). *See* FED. R. CIV. P. 73(b). Les Schwab moved for summary judgment on all of Hicks' claims (ECF No. 28). *See* FED. R. CIV. P. 56. The Court heard oral argument on Les Schwab's motion for summary judgment. For the reasons explained below, the Court denies Les Schwab's motion for summary judgment.

## BACKGROUND[3]

### Hiring of Hicks

Les Schwab hired Hicks on or about March 15, 2014, as a part-time sales and administrative employee. (Am. Compl. ¶ 7.) Hicks was responsible for sales, payroll, and opening customer credit accounts. (*Id.* ¶ 8.) Hicks reported to David Jensen ("Jensen"), the store manager at Les Schwab's service location in Nyssa, Oregon. (*Id.* ¶¶ 3, 9.) During Hicks' interview for the position, Jensen told Hicks she would start as a part-time employee and later transition to full-time employment. (Decl. Michael Owens Supp. Resp. Mot. Summ. J. ¶ 3, ECF No. 41 (hereinafter "Owens Decl."), Ex. 2, at 5.) The advertisement for the position "clearly stated it was a full-time position" (*id.* Ex. 2, at 5), and the previous employee who held the position, Mariah Harrison, worked full-time at the time of her departure. (*Id.* Ex. 3, at 6.) Hicks became a full-time employee on or about March 16, 2015. (*Id.* at 9-10.)

---

[2] Hicks concedes her state law claim of sex discrimination (O.R.S. § 659A.030(1)(a)-(b)). (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 26.)

[3] Unless otherwise noted, the following facts are either undisputed or viewed in the light most favorable to Hicks.

**Performance Evaluations and Pay Raise**

Jensen gave Hicks an overall performance rating of two out of three on a performance evaluation dated May 8, 2014, and told Hicks "it was an excellent review." (*Id.* Ex. 2, at 6.) Sometime in March 2015, Jensen gave Hicks another rating of two out of three, stating on the evaluation that Hicks needed improvement in the areas of work ethic, task completion, and trainability. (*Id.* at 7.) Jensen told Hicks he was referring to wanting her to spend some of her time working outside in the service bays to assist the sales and service employees by recording vehicle information, such as make and model, license numbers, and mileage. (*Id.*) This work sometimes required running and getting in and out of vehicles. (*Id.* at 19.) At Hicks' next performance review on August 31, 2015, she received a rating of one out of three. (*Id.* at 7-8.)

Jensen "remember[s] getting customer complaints about [Hicks] since right after she started." (*Id.* Ex. 3, at 14.) He asserts that, "We had a lot of problems with her attitude and how she treated customers, her demeanor with other people on the crew, and a lot of complaints." (*Id.* at 13.) Jensen further asserts that Hicks' bad attitude was because "she hadn't had a raise." (*Id.* at 49.) Hicks received a discretionary pay raise on October 1, 2015. (*Id.* at 12-13.) "You know, she was on me persistent, and I finally gave her a raise[,]" Jensen testified. (*Id.* at 49.)

**The Accident and Resultant Injury**

On November 3, 2015, Brian Blackmore ("Blackmore"), assistant store manager at the Nyssa store, was operating a pad hoist, which dropped onto Hicks' feet and trapped her. (*Id.* at 15-16, 30.) Jensen witnessed the accident, heard Hicks yelling, and helped remove the hoist from Hicks' feet. (*Id.* at 16.) Hicks went to the emergency room and was diagnosed with a "crush" injury to her left foot. (Am. Compl. ¶ 10.)

On November 5, 2015, Hicks saw Dr. Lawrence Sladich ("Dr. Sladich"), who specializes in occupational medicine. (Decl. Karen O'Kasey Supp. Def.'s Reply Supp. Sum. J. Mot. ¶ 10, ECF No. 44 (hereinafter "O'Kasey Reply Decl."), Ex. 9, at 1-2.) Dr. Sladich gave Hicks a recommended work status of "no work capacity." (*Id.* at 2.) He placed her left foot in a walking boot and recommended that it not bear weight for two days. (*Id.*) He wrote that Hicks could return to work on November 7, 2015, but should not run or jump and should continue wearing the walking boot. (*Id.*) Dr. Sladich cleared Hicks for a regular return to work after Les Schwab clarified that running and jumping were not essential functions of Hicks' job, *i.e.*, that her job is sedentary. (Owens Decl. Ex. 2, at 45; Decl. Karen O'Kasey Supp. Def.'s Mot. Summ. J. ¶ 5, ECF No. 30 (hereinafter "O'Kasey Decl."), Ex. 4.)

Hicks returned to work on November 7, 2015. (Owens Decl. Ex. 2, at 12.) She had many doctor appointments and physical therapy sessions during subsequent weeks. (*Id.* at 12-14.) After each doctor appointment, Hicks' medical provider faxed information regarding the appointment, necessary treatment, and medications to Les Schwab. (*Id.* at 12-13.) Other than absences for medical appointments, Hicks worked her regular schedule through 2015. (*Id.* at 14.) In a report dated December 1, 2015, and in Patient Visit Summaries dated December 31, 2015, April 11, 2016, November 17, 2016, and December 29, 2016, Dr. Sladich cleared Hicks to perform sedentary work. (O'Kasey Decl. Ex. 1, at 1; Owens Decl. Ex. 1, at 1-4.)

Hicks also saw two orthopedic surgeons during this time period: Dr. Sladich referred her to Dr. Bob Davis in Fruitland, Idaho, and Dr. Davis referred her to Dr. Coughlin (first name unknown) in Boise, Idaho. (*Id.* Ex. 2, at 10.) Hicks testified that her crush fracture, also known as a "nut cracker break[,]" cannot be repaired by surgery because the bones are broken such that "there is nothing to pin back together." (*Id.* at 4.)

Hicks wore the orthopedic boot on her left foot for more than one year. (*Id.* at 12.) She attended physical therapy to treat her foot injury through March 2017. (*Id.* at 3.) On July 18, 2017, Hicks described her pain as follows: "[S]ome days my foot is fine. There are other days that my foot kills me." (*Id.* at 4.) Her medical restrictions included no long-term standing, running, jumping, squatting, or bending. (*Id.* at 20.) As of April 5, 2018, Hicks' injury had not fully healed and was "not expected to fully heal at any time in the foreseeable future." (Decl. Elizabeth Hicks Supp. Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. 2, ECF No. 42 (hereinafter "Hicks Decl.").) Hicks described ongoing impairments caused by the injury, such as being unable to ski, go on long hikes, or "stand for long periods of time without experiencing pain[,]" and difficulty "dancing with my husband or going down stairs without stumbling or falling." (*Id.*)

### Workers' Compensation Claim

Hicks filed a workers' compensation claim on or about November 3, 2015. (Am. Compl. ¶ 10.) The claim was accepted on or about December 29, 2015. (*Id.* ¶ 22.) On November 10, 2015, Sarah Key ("Key"), who worked in Les Schwab's workers' compensation department, emailed Jensen and Blackmore regarding Hicks' claim, informing them that "[a]t this time your store will be charged the medical only service charge of a maximum of $300.00." (Owens Decl. Ex. 3, at 65.) The claim later became a "time-loss" claim, resulting in a one-time $1,500 charge. (*Id.* Ex. 4, at 3; Ex. 5, at 4.) Such a charge impacts a store's profit margin (*id.*), and profitability can impact employee bonuses (*id.* at 5). However, Jensen testified that such an impact is "almost nothing." (O'Kasey Reply Decl. Ex. 1, at 2.)

Christopher Church ("Church") replaced Jensen as store manager of the Nyssa store on April 1, 2016. (O'Kasey Decl. Ex. 10, at 4; Owens Decl. Ex. 5, at 3.) Sometime after Church

became store manager, Key notified Church that Hicks had a workers' compensation claim and was set to return to work. (Owens Decl. Ex. 5, at 2.) Church understood that a time-loss claim could affect the store's profits and employee bonuses. (*Id.* at 3-5.) Key did not inform Church that Hicks had made a claim with the Oregon Bureau of Labor and Industries ("BOLI") against Les Schwab. (*Id.* at 2.)

### First Disciplinary Write-Up: Customer Credit Account

On December 21, 2015 (approximately six weeks after Hicks' injury), Jensen and Blackmore met with Hicks to discipline her for opening a customer credit account for herself and her husband in March 2015. (*Id.* Ex. 3, at 28-29.) Hicks received a write-up because management did not authorize the credit account. (O'Kasey Decl. Ex. 2, at 1-2.) The write-up did not specify what policy Hicks had violated. (*Id.* at 1.)

This was the first time Hicks had received an "Employee Conference Record (Form 123)," which Jensen describes as "a letter to the employee, letting them know that you have a problem with their performance, or safety, or an issue they're having at work." (Owens Decl. Ex. 3, at 20-21.) Jensen asserts that previously he had informally documented issues in Hicks' file. (*Id.* at 21; *see also id.* at 66 (listing in Hicks' file nine such issues, including calling in sick, running her own credit report, customer complaints, going home early for a hair appointment, not offering to help a fellow employee, and four instances of missing work for a doctor appointment).) After Hicks' injury, Jensen had spoken with Joy Cox ("Cox"), a Les Schwab human resources business partner assigned to the Nyssa store, who told Jensen to start formally documenting any issues with Hicks and reminded him that Hicks had an open workers' compensation claim. (*Id.* at 21, 55-56.)

With respect to opening the credit account, Hicks had unilateral authority to open

customer credit accounts for customers whose credit scores were above a certain threshold score.

(O'Kasey Decl. Ex. 7, at 10.) Hicks was required to check with Jensen or Blackmore before

opening credit accounts for customers whose credit scores were below that threshold. (Owens

Decl. Ex. 3, at 28.) At his deposition, Jensen could not identify a policy that Hicks had violated

by opening her own credit account, but said that "[i]t's kind of a common sense issue." (O'Kasey

Decl. Ex. 7, at 10.) Jensen also referenced Les Schwab's credit score guidelines and said, "I was

never able to see any of that on [Hicks'] account . . . ." (*Id.*) In addition to Jensen, neither

Blackmore nor Cox could identify a policy that Hicks violated by her actions. (Owens Decl. Ex.

4, at 6; Ex. 6, at 2-3.) However, in its reply (ECF No. 43), Les Schwab now asserts that Hicks

violated at least two provisions of Les Schwab Tire Centers Code of Business Conduct ("the

Code"): one requiring employees to avoid conflicts of interest "between personal business

interests and the interests of the Company" and another stating that "no person shall receive

discounts, terms, business opportunities or any other special treatment based on their relationship

or friendship with a Company employee." (Def.'s Reply Supp. Mot. Summ. J. at 3-4; O'Kasey

Reply Decl. Ex. 3, at 3-4.)

Hicks opened the credit account in or around March 2015. (Am. Compl. ¶ 17.) She

asserts that she told Jensen that she had opened the account for herself and her husband at that

time. (Owen Decl. Ex. 2, at 23.) Jensen testified that he disciplined Hicks regarding the account

the day he discovered it, on December 21, 2015. (O'Kasey Decl. Ex. 7, at 9.) He said he

discovered the account while "going through credit and the accounts receivable." (*Id.*) Cox

testified that Jensen discovered the account the day he called her to discuss it, on December 17,

2015. (O'Kasey Reply Decl. Ex. 2, at 2-4.) However, Jensen had previously credited Hicks'

credit account fifty dollars when Hicks' husband traded in tires. (Owens Decl. Ex. 2, at 24.) When asked about crediting an account in the names of Hicks and her husband, Jensen testified, "I recall something about that. I don't remember the details of it." (*Id.* Ex. 3, at 24.) Jensen further testified that Hicks had a "bad debt write-off account" for Les Schwab's Vale store, but he did not know what he credited to that account and could not recall what he did with the credit for the tires. (*Id.* at 25-26.) Blackmore testified that a manager generally would be able to tell which Les Schwab store is associated with an account when crediting that account. (*Id.* Ex. 4, at 5-6.)

### Second Disciplinary Write-Up: Bad Attitude

On December 23, 2015, two days after Hicks received the first disciplinary write-up, Jensen and Blackmore again met with Hicks, and Jensen gave Hicks a second disciplinary write-up. (*Id.* Ex. 3, at 33; Ex. 2, at 25.) The write-up stated that "Elizabeth has a poor attitude at work. She is being combative, reserved, and is ignoring management." (O'Kasey Reply Decl. Ex. 4, at 2.) Jensen testified that he wrote up Hicks because, "since the first write-up, her attitude was never the same. She . . . never had a great attitude . . . . But the attitude went extremely downhill." (Owens Decl. Ex. 3, at 32.) At the meeting, Jensen told Hicks "that her attitude has to turn around. We can't have her around the customers . . . with an attitude like that." (*Id.* at 33.)

Hicks testified that in the meeting Jensen told her she "was being really reserved and quiet that day." (*Id.* Ex. 2, at 25.) Hicks told Jensen that "didn't have anything to do with Les Schwab" but was because her best friend had called her earlier that morning and told her that another friend had testicular cancer and would soon undergo surgery. (*Id.*) In addition, Hicks testified that just before the meeting several Les Schwab employees, including Blackmore, "engag[ed] in an inappropriate workplace conversation." (*Id.* at 26.) Hicks asserts that she

ignored the conversation, and Jensen and Blackmore called the disciplinary meeting with her minutes later. (*Id.* at 25-27.) Jensen does not recall Hicks telling him about a phone call from her friend and denies that the inappropriate workplace conversation occurred. (Owens Decl. Ex. 3, at 33-34.) He asserts that Hicks was ignoring others at work because she was mad about the first write-up. (*Id.* at 33.) Hicks refused to sign the second write-up. (*Id.* at 32.)

### First Layoff

During the same December 23, 2015, meeting, Jensen and Blackmore informed Hicks that she was being seasonally laid off. (*Id.* at 35.) Hicks' hours were reduced to zero, which Blackmore testified was not abnormal. (O'Kasey Decl. Ex. 9, at 3-4; *see also id.* Ex. 10, at 5-6.) Hicks was placed on seasonal layoff status during the prior winter as well but worked reduced hours during that layoff. (*Id.* Ex. 7, at 7-8.) The business slowdown during winter 2015-2016 was "similar" to the slowdown during the prior winter. (Owen Decl. Ex. 3, at 52.) Seasonal layoffs during the winter months are typical at Les Schwab stores. (O'Kasey Decl. Ex. 7, at 4; Ex. 9, at 2; Ex. 10, at 4-5.) At the time Hicks was laid off, two other employees had already been placed on seasonal layoff, and another employee went on seasonal layoff the following month. (Decl. Dave Jensen Supp. Def.'s Mot. Summ. J. 1-2, ECF No. 29.) Hicks understood that she was "being laid off as of December 23rd as part of the seasonal layoff." (O'Kasey Decl. Ex. 8, at 8.) However, Jensen testified that Hicks' "poor attitude [was] part of the reason that [she] was put on a seasonal layoff." (Owens Decl. Ex. 3, at 35.)

Jensen and Blackmore also informed Hicks during the December 23, 2015, meeting that they were considering changing her position from full-time to part-time when she returned from layoff. (O'Kasey Decl. Ex. 8, at 7.) Hicks asserts and Jensen denies that Jensen was considering the change because of the time Hicks was away from work attending medical appointments.

(Owens Decl. Ex. 2, at 41; *Id.* Ex. 3, at 36.) Blackmore testified that he and Jensen "felt that [they] could do [Hicks'] job duties and . . . reduce wages." (O'Kasey Decl. Ex. 9, at 3.)

Later that same day, Hicks called Les Schwab's human resources hotline. (Owens Decl. Ex. 2, at 30.) She reported that she had been injured and felt that she was being laid off as a result of her injury. (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 9.) She was referred to Gary Kennedy ("Kennedy"), a regional manager who oversaw the Nyssa store. (Owens Decl. Ex. 2, at 30.) Hicks called Kennedy, who was not aware of her injury and told Hicks he would get back to her after making some calls. (*Id.*) Kennedy called Jensen and then called back Hicks within an hour. (*Id.* at 31.) Hicks alleges that Kennedy was "nice" during the first call and that during the second call "his demeanor had completely changed." (*Id.* at 30-31.) Specifically, Hicks alleges that Kennedy asked her what she was trying to accomplish by her phone call and told her that he would "always have [his] manager's back." (*Id.* at 31.) In addition, Hicks alleges that Kennedy told her that Jensen was not aware of Oregon law regarding time loss. (*Id.*) Hicks expressed disbelief and stated that Jensen should know such laws as a store manager, and Kennedy "got upset" and asked whether Hicks was implying that Jensen was a liar. (*Id.*)

On December 28, 2015, Jensen put a note in Hicks' file stating that she had violated company policy by using vacation time to attend doctor appointments for her injury without management approval. (*Id.* Ex. 3, at 44-45.) The note further stated that Hicks had falsely claimed that Key approved such use of her vacation time. (*Id.* at 45.) Hicks asserts that soon after her injury Blackmore had told her that she would be paid for the time she spent at appointments but that on or around December 21, 2015, Jensen told her that he would not continue to pay her for such time. (*Id.* at 27.)

## Status Change and Revocation of Benefits

On December 31, 2015, Jensen changed Hicks from a full-time employee to a part-time employee, effective that day. (*Id.* at 51-52.) Jensen listed the status change as a "[d]emotion" on the Les Schwab Employee Transfer / Pay Change form. (*Id.* at 36, 51, 72.)

On January 28, 2016, Jensen submitted two Les Schwab Employee Leave / Layoff / Return to Work forms, both effective December 31, 2015. (*Id.* at 71; O'Kasey Decl. Ex. 3.) On one, Jensen listed the status change type as "Leave" and selected the "Work Comp - work related" option. (Owens Decl. Ex. 3, at 71.) On the other, Jensen listed the status change type as "Leave" and selected three options: "Medical - not work related[,]" "Work Comp - work related[,]" and "Personal[.]" (O'Kasey Decl. Ex. 3.) The record is not clear as to why Jensen submitted two conflicting forms.

Because of Hicks' demotion to part-time status, she no longer was eligible for insurance benefits, including health insurance. (Owens Decl. Ex. 3, at 36, 39.) Hicks also lost her eligibility for retirement benefits — an amount equal to fifteen percent of Hicks' wages that Les Schwab deposited into a retirement account. (*Id.* at 46-47.) For those reasons, Blackmore described the status change as a demotion. (*Id.* Ex. 4, at 10-11.)

No other employee at the Nyssa store received a similar status change. (*Id.* Ex. 3, at 52.) Les Schwab asserts that Dr. Sladich restricted Hicks to sedentary work on December 31, 2015, and that "Les Schwab converted [P]laintiff's layoff status to medical leave because at that point, she was unable to return to work due to her work restriction." (Def.'s Mot. Summ. J. at 3; *see also* O'Kasey Decl. Ex. 1 (report from Dr. Sladich changing Hicks' work status to "Restricted Duty" and recommending "[s]edentary work[]"); *see also* O'Kasey Reply Decl. Ex. 6, at 1 (email from a Les Schwab leave administrator notifying Jensen and Blackmore that Hicks was

on "leave status" because her "doctor gave her work restrictions as of 12/31"); *see also id.* at 2-3 (letter from the leave administrator dated January 27, 2016, notifying Hicks of her rights and responsibilities while on medical leave).)

Jensen testified that his understanding after submitting the Les Schwab Employee Transfer / Pay Change form on December 31, 2015, was not that Hicks would work zero hours as of that date (*i.e.*, that Hicks was on medical leave), but that Hicks would work part-time. (Owens Decl. Ex. 3, at 40.) Jensen also testified that Hicks lost her insurance after her seasonal layoff as a result of "go[ing] to part-time[.]" (*Id.* at 36.) Neither Jensen nor Blackmore attributed Hicks' status change to increased medical restrictions or medical leave. (*Id.* at 36-40; Ex. 4, at 10-12.) Hicks asserts that she was never told that her employment status changed to part-time on December 31, 2015, but that Jensen told her during the December 23, 2015, meeting that he and Blackmore were considering the change. (*Id.* Ex. 2, at 21-22.)

Hicks asserts that it is not clear on the face of the December 31, 2015, report from Dr. Sladich (*see* ECF No. 31) that Hicks was unable to return to work due to her medical restrictions. Dr. Sladich's December 1, 2015, Patient Visit Summary restricted Hicks from running and jumping and required her to wear a walking boot while at work. (Owens Decl. Ex. 1, at 1.) The December 31, 2015, report changed Hicks' work status to "Restricted Duty" but still allowed sedentary work. (O'Kasey Decl. Ex. 1, at 1.) Hicks could perform her regular job duties while sedentary. (*Id.* Ex. 2, at 15-16.) She could not run or jump, *i.e.*, work in the service bays, but those were not part of her typical job requirements. (*Id.*; O'Kasey Decl. Ex. 4.)

### New Manager and Return with Reduced Hours

Before Hicks was laid off, she was scheduled to work in January 2016. (Owens Decl. Ex. 2, at 28-29.) Beginning in that month and continuing on a weekly basis, Hicks called Jensen and

Blackmore and requested to return to work. (*Id.* at 29.) Jensen and Blackmore told Hicks that they did not need her because they were performing her job duties.[4] (*Id.*; *see also id.* Ex. 4, at 12.) Hicks received time-loss payments from her workers' compensation claim during the time she was laid off. (*Id.* Ex. 2, at 29.)

On March 18, 2016, Les Schwab's leave administrator, Sally Heise ("Heise"), wrote a letter to Hicks regarding her medical leave. Heise asked Hicks for information regarding her medical needs and requested that Dr. Sladich complete an attached Medical Certification form. (O'Kasey Reply Decl. Ex. 6, at 4.) On March 31, 2016, Dr. Sladich faxed the completed form to Heise, indicating that Hicks had an impairment that prevented her from standing continuously or bearing much weight on her left leg. (O'Kasey Decl. Ex. 5.)

In April 2016, Church became the new store manager of the Nyssa store, and Jensen transferred to another Les Schwab store. (*Id.* Ex. 3, at 3, 47.) When Church arrived, Jensen "gave him a quick rundown on the employees and different situations." (*Id.* at 3-4.) Jensen told Church that Hicks "was an employee that we were having some issues with, and she was on layoff. And . . . it was up to his decision . . . where he wanted to move forward with her." (*Id.* at 4.) Blackmore and Church continued to perform Hicks' job duties. (*Id.* Ex. 4, at 13-14.)

On April 11, 2016, Dr. Sladich sent to Les Schwab another Patient Visit Summary, which continued to restrict Hicks to sedentary work and from bearing weight on her left foot. (Owens Decl. Ex. 1, at 2.) Nevertheless, on April 15, 2016, Les Schwab sent Hicks a letter offering her a temporary light-duty assignment. (*Id.* Ex. 2, at 44.) Hicks declined because she had an

---

[4] Hicks asserts that Daniel Whalin ("Whalin"), a full-time sales and service employee at the Nyssa store, sprained his back while working in December 2015, took some vacation time, and then performed Hicks' sales and administrative duties until his back was well enough for him to return to his job in the service bays. (*Id.* at 38-40.)

appointment on the start date. (*Id.* at 34.) On April 22, 2016, Les Schwab sent a second offer letter with a new start date, which Hicks accepted. (*Id.* at 35, 46.)

Hicks returned to work on May 2, 2016. (*Id.* at 35.) After her return, she was scheduled to work one day per week. (*Id.* at 36.) Hicks asked Church for more hours, and Church told her there were no additional hours available. (*Id.* at 35-36.)

### Second Layoff, Requests for Reinstatement, and Termination

On November 17, 2016, and December 29, 2016, Dr. Sladich sent to Les Schwab Patient Visit Summaries continuing to restrict Hicks to sedentary work. (*Id.* Ex. 1, at 3-4.) On January 2, 2017, Hicks, who was still working one day per week, was placed on seasonal layoff again due to "[b]usiness slowdown." (O'Kasey Decl. Ex. 10, at 6-7, 9-10.) She and one other laid-off employee were given zero hours, whereas the other laid-off employees were put on reduced schedules. (*Id.* at 5-6.) Hicks asserts that Blackmore indicated she might return around March 2017. (Owens Decl. Ex. 2, at 37.) She contacted Blackmore in January and February, asking to return to work, but Blackmore told her that he had no available hours. (*Id.*) On February 9, 2017, Hicks took a full-time job at Waremart by WinCo ("Waremart") in Ontario, Oregon.[5] (*Id.* at 2.) However, after starting work at Waremart, Hicks again asked Blackmore to return to work and was told he had no available hours. (*Id.* at 37.) Of the employees who were seasonally laid off, Hicks was the only employee not asked to return to work. (*Id.* Ex. 4, at 15.)

Blackmore testified that Hicks was eligible for rehire but that he would not rehire her if he had hours available because of "[t]rainability." (*Id.*) Church testified that business picked up

---

[5] In addition to applying at Waremart, Hicks applied for jobs at Silverhawk Realty and D. L. Evans Bank. (O'Kasey Decl. Ex. 8, at 3, 18.) Hicks did not indicate on any of the employment applications that she had a disability or required an accommodation. (*Id.* at 4-5, 18-19.) Hicks testified that she did not so indicate because the positions required sedentary work, which she could do without an accommodation. (*Id.* at 4.)

after this seasonal layoff, but he did not bring back Hicks "[b]ecause in a store the size of Nyssa, I do not find it necessary to have a sales and administrative position." (O'Kasey Decl. Ex. 10, at 7.) Church testified that he and Jensen took over Hicks' duties without assigning any of his or Hicks' work to other employees and without working any additional hours. (*Id.* at 8.) He did not hire anyone to replace Hicks. (*Id.* at 6.)

## ANALYSIS

### I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (citations omitted). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### II.      DISCUSSION

#### A.      Hicks Is Disabled within the Meaning of the ADA.

Les Schwab argues that Hicks is not disabled within the meaning of the ADA because (1) her foot fracture is a temporary injury and (2) her foot fracture does not substantially limit any major life activities. (Def.'s Mot. Summ. J. at 5-7.)

To establish a *prima facie* case of disability discrimination under either the federal or state ADA,[6] Hicks must first demonstrate that she has a disability as defined by the ADA. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). The term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). Enumerated "major life activities" include performing manual tasks, walking, standing, lifting, and bending, among others. 29 C.F.R. § 1630.2(i)(1)(i) (2018). "Whether an activity is a major life activity is not determined by reference to whether it is of central importance to daily life." 29 C.F.R. § 1630.2(i)(2) (quotation marks omitted). Furthermore, "[t]he term substantially limits shall be construed broadly in favor of expansive coverage . . . ." 29 C.F.R. § 1630.2(j)(1)(i) (quotation marks omitted); *see also* O.R.S. § 659A.139(2) (same). "An impairment need not prevent, or significantly or severely, restrict the individual from performing a major life activity . . . ." 29 C.F.R. § 1630.2(j)(1)(ii). Rather, the question is whether the impairment substantially limits the individual's ability to perform "as compared to most people in the general population." *Id.* This "determination . . . requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv).

Here, Hicks' alleged disability is her foot fracture, which she asserts substantially limits her ability to stand, walk, and run. (Am. Compl. ¶ 31; *see also* O'Kasey Decl. Ex. 5.) She also asserts substantial limitation of her ability to squat and "perform[] a number of life activities that require coordination and the use of her foot, including dancing, skiing, and traversing stairs." (Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. at 23; *see also* Hicks Decl. ¶ 4 (reporting being unable

---

[6] O.R.S. § 659A.139(1) provides that Oregon's discrimination laws "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990[.]"

to "stand for long periods of time without experiencing pain" and difficulty "going down stairs without stumbling or falling").)

Les Schwab argues that Hicks' foot fracture does not qualify as a disability because it was a temporary injury.[7] (Def.'s Mot. Summ. J. at 5-6.) The Court disagrees. To be sure, temporary injuries (*e.g.*, broken bones) do not typically qualify as disabilities. *See Parks v. Port of Oakland*, No. 16-CV-04061-HSG, 2017 WL 2840704, at *4 (N.D. Cal. July 3, 2017) (finding that a torn rotator cuff did not qualify as a disability where the plaintiff did not allege that her injury was chronic). However, that general rule does not apply here because Hicks' crush fracture could not be surgically repaired. (Owens Decl. Ex. 2, at 4.) In lieu of surgery, Hicks was required to wear an orthopedic boot for more than a year and she attended physical therapy through at least March 2017. (*Id.* at 3, 12.) Furthermore, despite the injury occurring in November 2015, she continued to be restricted from long-term standing, running, jumping, squatting, and bending. (*Id.* at 20.) Almost four years after the accident, Hicks' crush fracture is not expected to heal in the foreseeable future. (Hicks Decl. ¶ 4.) For those reasons, the fracture is

---

[7] In support of its position, Les Schwab points to the fact that Dr. Sladich released Hicks back to work without restrictions and his later restrictions were in place for only three months. (Def.'s Mot. Summ. J. at 6.) To the contrary, Dr. Sladich initially restricted Hicks from running and jumping. (O'Kasey Reply Decl. Ex. 9, at 2; *Id.* Ex. 10; Owens Decl. Ex. 1, at 1.) Dr. Sladich then released Hicks to work without restrictions because Les Schwab faxed him a letter informing him that Hicks' job did not require running or jumping. (O'Kasey Decl. Ex. 4.) In other words, Dr. Sladich's release indicates that Hicks' injury did not require restrictions *at work*, not that it did not require restrictions in other aspects of her life. Furthermore, Dr. Sladich's later Patient Visit Summaries restricted Hicks to sedentary work. Owens Decl. Ex. 1, at 2-4 (dated Apr. 11, 2016, Nov. 17, 2016, and Dec. 29, 2016).

Similarly, Les Schwab relies on Dr. Sladich's report that Hicks' "work-related conditions" were medically stationary as of July 17, 2017, and that she could return to her former position at Les Schwab without permanent restrictions. (Def.'s Reply Supp. Mot. Summ. J. at 11; O'Kasey Reply Decl. Ex. 11, at 1.) However, the fact that an injury is not worsening does not mean that it is improving or that it does not amount to a current disability. Furthermore, as discussed above, Hicks did not require restrictions at work because her position was sedentary.

not temporary. *See Norris v. Allied-Sysco Food Servs., Inc.*, 948 F. Supp. 1418, 1434 (N.D. Cal. 1996) (finding that a reasonable jury could have concluded that plaintiff had a disability, where she suffered from back pain more than two years after her injury occurred); *Castillo v. United States Internal Revenue Serv.*, No. 1:13-CV-00517-SKO, 2016 WL 310114, at *8 (E.D. Cal. Jan. 26, 2016) ("declin[ing] to engage in an exhaustive analysis over whether an ankle injury that is expected to eventually heal is temporary or permanent" because "do[ing] so would contravene Congress' intent in defining a disability . . . as an impairment substantially limiting a major life activity") (quotations omitted); *Werner v. Sturgeon Elec. Co., Inc.*, No. 3:16-CV-01334-MO, 2017 WL 3473179, at *5-6 (D. Or. Aug. 11, 2017) (concluding that plaintiff's testimony that his hand was still impaired after healing from surgery on tendon damage caused by a deep cut was sufficient evidence for a reasonable jury to find plaintiff disabled).[8]

Les Schwab also argues that Hicks' crush fracture does not substantially limit any major life activity.[9] (Def.'s Mot. Summ. J. at 6-7.) The Court disagrees. Of the life activities Hicks lists

---

[8] The ADA Amendments Act of 2008 (the "ADAAA") was introduced to supercede a case in which the Supreme Court suggested that temporary impairments do not qualify as disabilities. *Werner*, 2017 WL 3473179, at *5. Under the related Equal Employment Opportunity Commission ("EEOC") regulations, "effects of an impairment that last fewer than six months can still be considered substantially limiting . . . ." *Id.* The Fourth Circuit, the first to review the ADAAA, held that the EEOC's "'expansive definition [of impairment] surely includes broken bones and torn tendons.'" *Id.* at *6 (alteration in original) (quoting *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 333 (4th Cir. 2014). In reaching its conclusion, the *Werner* court acknowledged that the Ninth Circuit had not yet interpreted the ADAAA, but noted that the Northern District of California had followed the Fourth Circuit. *Id.* (citing *Barrilleaux v. Mendocino Cty.*, 61 F. Supp. 3d 906, 916 (N.D. Cal. 2014).

[9] Les Schwab cites as evidence the fact that, when applying for jobs, Hicks did not indicate that she had a disability or required an accommodation, as well as Hicks' statement that she did not need an accommodation. (Def.'s Mot. Summ. J. at 7.) Regarding her job at Waremart, Hicks explained that the application asked whether she had a disability that would limit her ability to perform her job duties, which she answered in the negative because the job "is a bookkeeping position, which is a sedentary position." (O'Kasey Decl. Ex. 8, at 4.) The other two jobs Hicks applied for — a "receptionist-type position" at Silverhawk Realty and "opening new accounts" at D. L. Evans Bank — were also sedentary. (*Id.* at 18-19.) The fact that Hicks

as limited, at least standing and walking qualify as "major" under the relevant regulations.[10] *See* 29 C.F.R. § 1630.2(i)(1)(i). Furthermore, considering "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment[,]" Hicks' crush fracture is substantially limiting. *Parks*, 2017 WL 2840704, at *4; *see also Barrilleaux*, 61 F. Supp. 3d at 916 (holding that plaintiff's allegations that she "required crutches to walk or otherwise walks with difficulty due to a [knee fracture] . . . reflect[ed] a substantial impairment in the major life activity of walking" and thus were sufficient to survive a motion to dismiss).

Hicks' impairment is a crush or "nutcracker" fracture so severe that Hicks' bones cannot be pinned back together. Despite extensive time in an orthopedic boot and physical therapy, the fracture has not fully healed in almost four years' time. Nor is the fracture expected to heal in the foreseeable future.[11] The fracture impacts Hicks' ability to do basic activities such as standing and walking, as well as certain recreational activities. Finally, the fracture causes Hicks severe pain.[12] The Court finds Hicks' impairment to be substantially limiting, and therefore it qualifies as a disability under the ADA.

---

did not disclose a disability or request an accommodation does not necessarily evidence that Hicks is not disabled. Rather, it signifies that she did not have a disability that would prevent her from performing sedentary work.

[10] Thus, the Court need not consider whether the other activities Hicks names (*i.e.*, skiing and dancing) qualify.

[11] Les Schwab points out that Dr. Sladich reported on March 31, 2016, that Hicks' impairment was not permanent and would likely last two to three months. (Def.'s Reply Supp. Mot. Summ. J. at 10-11; O'Kasey Decl. Ex. 5.) Even had that turned out to be true, Hicks could still demonstrate a substantial limitation. *See* 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.").

[12] Les Schwab asserts that "Hicks was only occasionally affected by the fracture[,]" citing her testimony that "some days my foot is fine. There are other days that my foot kills me."

**B.** **Hicks Has Established Disputed Issues of Material Fact.**

There remain at least two significant disputes of material fact in this case. First, the parties dispute whether Les Schwab was aware that Hicks had opened her own credit account and set her own credit limit months before disciplining her for doing so. Second, the parties dispute why Les Schwab placed Hicks on seasonal layoff, and later changed her employment status to part-time following her injury. These factual disputes preclude summary judgment.

**1.** **Whether Les Schwab Was Aware of Hicks' Alleged Policy Violation Months Prior to the Post-Injury Discipline**

Hicks alleges that Jensen formally disciplined her shortly after her injury for opening a customer credit account nine months earlier, of which he was contemporaneously aware. (Am. Compl. ¶ 17.) Citing Jensen's deposition testimony (ECF No. 29, Ex. 7), Les Schwab responds that Jensen disciplined Hicks in December 2015, immediately after learning what she had done. (Def.'s Mot. Summ. J. at 9.)

Hicks supports her allegation with several facts, including: (1) Hicks' testimony that Jensen had known about the account and had placed a credit for tires on it; (2) Jensen's inability to dispute Hicks' testimony regarding the credit to her account; (3) Blackmore's testimony that a manager would be able to tell which Les Schwab store an account was for when placing a credit; and (4) Jensen's and Cox's inability to identify a specific policy Hicks had violated by opening the account. (*Id.* at 13-14.) Furthermore, Hicks asserts that the timing of the discipline, in relation to her injury and to Cox instructing Jensen to begin formally documenting any issues with Hicks and reminding him of Hicks' workers' compensation claim, supports her allegation. (*Id.* at 14-15.) In its reply (ECF No. 43), Les Schwab relies on Jensen's and Cox's testimony that Jensen

---

(Def.'s Mot. Summ. J. at 6; O'Kasey Decl. Ex. 8, at 3.) However, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity *when active*." 29 C.F.R. § 1630.2(j)(1)(vii) (emphasis added).

disciplined Hicks the day he learned of the account and asserts, *post hoc*, that Hicks violated provisions of the Code. (Def.'s Reply Supp. Mot. Summ. J. at 2-4.)

Viewing the evidence in the light most favorable to Hicks and drawing all reasonable inferences in Hicks' favor, Les Schwab has not demonstrated the lack of a material factual dispute regarding when Jensen became aware of Hicks' credit account.

### 2. Les Schwab's Reasons for Placing Hicks on Seasonal Layoff and Changing Her to Part-Time Status

The parties dispute Les Schwab's motivations for placing Hicks on seasonal layoff in December 2015, and later changing her employment status to part-time (which resulted in a loss of benefits). Les Schwab asserts that it took those actions for legitimate, nondiscriminatory business reasons: "primarily lack of work and lack of need." (Def.'s Mot. Summ. J. at 9.)

Specifically, Les Schwab asserts that Jensen transferred Hicks to part-time status "because he did not need a full-time sales and administrative employee." (*Id.*) Les Schwab further asserts that "[p]art-time employees do not receive medical or other benefits[,]" and "[t]he only reason [P]laintiff lost her benefits was because she became a part-time employee." (*Id.*) Regarding the December 2015 seasonal layoff, Les Schwab asserts that such layoffs at Les Schwab are routine "during periods of slow business, typically in the winter[,]" and Hicks testified she knew she was included in a seasonal layoff. (*Id.* at 10.) Les Schwab supports its assertions with citations to the deposition testimony of Jensen, Blackmore, Church, and Hicks. (*Id.* at 9-10.)

In her response (ECF No. 40), Hicks sets forth several specific facts demonstrating a genuine issue for trial. First, she relies on Jensen's deposition testimony that her attitude — for which he issued her a second disciplinary write-up — was part of the reason she was laid off. (Pl. Resp. Mot. Summ. J. at 15.) Second, Hicks points out that she worked three days per week

during the prior year's seasonal layoff, whereas she worked zero hours during the 2015-2016 seasonal layoff, despite Jensen's testimony that the business slowdown was about the same as the year before. (*Id.* at 15-16.) Third, Hicks asserts that Les Schwab's "current rationale" for Hicks' zero hours is not credible because Les Schwab has now proffered three inconsistent explanations: (1) Jensen's testimony that Hicks' attitude was part of the reason she was laid off; (2) Jensen's, Blackmore's and Church's testimony that business was slow; and (3) Heise's correspondence indicating that Hicks was placed on medical leave. (*Id.* at 16 (emphasis omitted).) Finally, Hicks notes that her layoff "was coupled with a demotion to part-time status," causing her to lose her health and retirement benefits, and that she was the only laid-off employee whose employment status was changed to part-time. (*Id.*)

The Court finds that Hicks has identified sufficient facts to demonstrate a genuine dispute of material fact for trial.

### C. The Material Factual Disputes Apply to All of Hicks' Claims.

Hicks brings federal and state disability claims of discrimination and retaliation. She also brings state workers' compensation claims of retaliatory discrimination, as well as failure to reinstate or reemploy. The disputes of material fact identified above apply to each of Hicks' claims. Accordingly, summary judgment is not appropriate.

### 1. Federal and State Disability Claims: Discrimination (42 U.S.C. § 12112 and O.R.S. § 659A.112) and Retaliation (42 U.S.C. § 12209 and O.R.S. § 659A.109)

To establish a *prima facie* case of federal or state disability discrimination, Hicks must show that "[she] is disabled within the meaning of the ADA[,]" "[she] is a qualified individual able to perform the essential functions of [her] job with reasonable accommodation[,]" and "[she] suffered an adverse employment action because of [her] disability." *Allen v. Pac. Bell*, 348

F.3d 1113, 1114 (9th Cir. 2003). Similarly, to establish a *prima facie* case of disability retaliation under federal or state law, Hicks must show "involvement in a protected activity," "an adverse employment action[,]" and "a causal link between the two." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004).

Both claims are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, which works as follows: Once Hicks establishes her *prima facie* case, the burden shifts to Les Schwab "to articulate some legitimate, nondiscriminatory reason" for its allegedly adverse actions. 411 U.S. 792, 802 (1973). Then the burden shifts back to Hicks to demonstrate that Les Schwab's purportedly neutral reason is pretext for unlawful discrimination. *Id.* at 804. She may do so directly, by showing evidence of discrimination, or indirectly, "by showing that the employer's proffered explanation . . . is internally inconsistent or otherwise not believable." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112–13 (9th Cir. 2011).

Here, Les Schwab asserts that any adverse employment actions "were taken for business reasons—primarily lack of work and lack of need." (Def.'s Mot. Summ. J. at 9.) Hicks responds that Les Schwab's proffered reasons are pretextual, and she has identified material factual disputes that call the proffered reasons into question, as discussed above. Therefore, summary judgment is not appropriate on Hicks' federal and state disability discrimination and retaliation claims. *Werner*, 2017 WL 3473179, at *6-7 (denying summary judgment where plaintiff established a genuine dispute of material fact as to why he was fired); *Ambrose v. J.B. Hunt Transp., Inc.*, No. 3:12-CV-01740-HU, 2014 WL 585376, at *20-21 (D. Or. Feb. 13, 2014) (same).

### 2. State Workers' Compensation Claims

#### a. Retaliatory Discrimination (O.R.S. § 659A.040)

To establish a *prima facie* case of retaliatory discrimination under O.R.S. § 659A.040, Hicks must demonstrate that she "invoked the workers' compensation system[,]" she was "discriminated against in the tenure, terms, or conditions of employment[,]" and Les Schwab discriminated against her *because* she invoked the workers' compensation system. *Kirkwood v. W. Hyway Oil Co.*, 204 Or. App. 287, 293 (2006) (citations omitted). As detailed above, Hicks has demonstrated that a dispute of material fact exists regarding whether she was, in fact, discriminated against in the "tenure, terms, or conditions of employment." *Id.* Thus, Les Schwab is not entitled to summary judgment on Hicks' retaliatory discrimination claim. *Duke v. F.M.K. Const. Servs., Inc.*, 739 F. Supp. 2d 1296, 1303 (D. Or. 2010) (denying summary judgment on plaintiff's workers' compensation retaliatory discrimination claim where "the record [was] replete with controverted testimony suitable to submit to an objectively reasonable juror").

#### b. Failure to Reinstate or Reemploy (O.R.S. § 659A.043 and O.R.S. § 659A.046)

Hicks also brings state workers' compensation claims under O.R.S. § 659A.043 and O.R.S. § 659A.046:

> Those statutes mandate that, upon demand, a worker who sustains a compensable injury shall be reinstated to the worker's former position (if it exists and is available) or an existing vacant and suitable position if the worker is not disabled from performing the duties of those positions, ORS 659A.043(1), or reemployed at another available and suitable position if the worker is disabled from performing the duties of the worker's former regular employment, ORS 659A.046.

*Lane v. Hood River Cty.*, No. 08-CV-428-ST, 2009 WL 1662990, at *9 (D. Or. June 11, 2009).

As discussed above, Hicks has demonstrated material factual disputes regarding why Les Schwab did not reinstate her to her former position following her injury. Therefore, Les Schwab

is not entitled to summary judgment on Hicks' failure to reinstate or reemploy claims. *See*

*Jenkins v. Vestas-Am. Wind Tech., Inc.*, No. 3:12-CV-01758-AA, 2014 WL 1364971, at *4 (D.

Or. Apr. 4, 2014) (denying summary judgment because a factual dispute existed "concerning

whether there may have been an open position for which plaintiff was qualified on or around the

time of his termination[,]" *i.e.*, "a reasonable jury could find that defendant's proffered non-

discriminatory reason for terminating plaintiff was pretextual"); *Werner*, 2017 WL 3473179, at

*4 (denying summary judgment where plaintiff "met his burden of citing evidence to support a

finding that [defendant's] nondiscriminatory explanation [was] pretextual").

## CONCLUSION

For the foregoing reasons, the Court DENIES Les Schwab's motion for summary

judgment (ECF No. 28).

**IT IS SO ORDERED.**

DATED this 29th day of August, 2018.

*Stacie F. Beckerman*
_____
STACIE F. BECKERMAN
United States Magistrate Judge